# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 2:07 CR 166 |
| WYNELL GRAY | ) | |

## OPINION AND ORDER

Defendant Wynell Gray has moved for a judgment of acquittal notwithstanding the verdict as to Counts 1 and 2 of the Indictment pursuant to FEDERAL RULE OF CRIMINAL PROCEDURE 29(c) (DE # 125) and for a new trial pursuant to RULE 33. (DE # 124.) The government has responded (DE # 136), and Gray has filed a reply (DE # 138) and a supplemental reply to the motion for a new trial. (DE # 141.)

The following is a much-abbreviated summary of the case. Gray and her co-defendant, Randy Suddoth, were charged with conspiracy to defraud the Indiana Medicaid Program in violation of 18 U.S.C. § 371 by submitting fraudulent billings to Indiana Medicaid on behalf of Dovies Medicar Transportation ("Dovies") from March 2002 to March 2004 (Count 1) and on behalf of Lane Medical Transportation ("Lane") from November 2005 to January 2006 (Count 3). (DE # 1 at 2, 5.) Count 2 of the Indictment charged defendants with executing a scheme to defraud the Indiana Medicaid Program in violation of 18 U.S.C. § 1347 by submitting fraudulent billings for Dovies stating that it had provided transportation services from April to August of 2004 on behalf of B. Hawkins when "in truth and in fact no transportation service was actually provided." (*Id.* at 4.) Counts 4, 5, 6, 7, 8, 9 and 10 charged defendants with executing a scheme to defraud through the operation of Lane. (*Id.* at 7-13.) Suddoth

plead guilty to Count 3 of the Indictment. (DE # 29.) A jury found Gray guilty of

Counts 1 and 2. (DE # 114.)

## Motion for Acquittal Notwithstanding the Verdict

### I.      STANDARD OF REVIEW

A RULE 29(c) motion should be granted only if there is no evidence from which a

rational juror could find the defendant guilty beyond a reasonable doubt. *United States*

*v. Galati,* 230 F.3d 254, 258 (7th Cir. 2000). In considering a RULE 29(c) motion, the court

will review all evidence and make all reasonable inferences in the light most favorable

to the government. *Id.* When evaluating the sufficiency of evidence to support a jury's

determination of guilt, a court must defer to the jury's role of evaluating credibility and

weighing evidence and should not re-weigh evidence or question the jury's credibility

determinations unless the evidence is "so improbable on its face that no reasonable

factfinder could accept it." *United States v. Paneras,* 222 F.3d 406, 410 (7th Cir. 2000);

*United States v. Yusufu,* 63 F.3d 505, 508-509 (7th Cir. 1995). Defendants challenging the

sufficiency of evidence at trial face a "nearly insurmountable hurdle." *Cueto,*

151 F.3d at 629.

### II.     ANALYSIS

Gray argues that the evidence presented at trial was insufficient to sustain her

convictions under both Counts 1 and 2 of the Indictment.

*Evidence presented on elements of agreement and intent for Count 1*

Gray's first argument is that the elements of agreement and intent to commit an offense were not established for Count 1 of the Indictment - conspiracy to defraud the U.S. government under 18 U.S.C. § 371. (DE # 125 at 2.) The following elements must be proven for a conviction under Section 371: "(1) an agreement to accomplish an illegal objective against the United States (2) one or more overt acts in furtherance of the illegal purpose; and (3) an intent to commit the substantive offense." *United States v. Cueto*, 151 F.3d 620, 635 (7th Cir. 1998). Gray contends that the only evidence of an agreement between herself and her co-defendant, Randy Suddoth, was the latter's uncorroborated testimony which also constituted a confession of his own guilt. (DE # 125 at 2.) She argues that the uncorroborated admissions of a coconspirator are insufficient to prove guilt beyond a reasonable doubt when there is no indicia of reliability.[1] (*Id.*) Gray contends that the only evidence of her intent to submit fraudulent billing to Indiana Medicaid was Suddoth's testimony. (*Id.* at 3.) She asserts that while other evidence at trial established that she submitted the billings to Medicaid, only Suddoth's

---

[1] The court notes that Gray's reliance on *United States v. Smallwood* for her statement that "[c]ourts have generally held that uncorroborated admissions are sufficient to prove guilt beyond a reasonable doubt, when there is no indicia of reliability" appears to be misplaced. (DE # 125 at 2 (citing 188 F.3d 905, 913 (7th Cir. 1999)).) In that case, the court was discussing whether the corroboration rule would limit the jury's reliance on a jailhouse informant's testimony about admissions that the defendant made to him. 188 F.3d at 913. It did not appear to involve testimony of a co-defendant.

uncorroborated testimony was offered to show that she intended to submit fraudulent billings. (*Id.*)

In response, the government argues that the corroboration rule relied upon by Gray applies only to the admissions of a defendant, not to the confessions of a defendant's coconspirator. (DE # 136 at 2-3.) It further contends that it presented evidence apart from Suddoth's testimony to prove both agreement and intent to participate in fraudulent billing for Dovies Medicar. (*Id.* at 3.) In reply, Gray argues that the basis for the corroboration rule, that defendants' confessions are suspect because of the pressure and coercion of criminal investigations, applies equally to the confessions of co-defendants. (DE # 138 at 12 (citing *United States v. Dalhouse*, 534 F.3d 803, 805-06 (7th Cir. 2008)).)

First, the Seventh Circuit does not appear to regularly apply the corroboration rule to the testimony of co-defendants. It has found that the jury can rely on in-court admissions of a coconspirator for a finding of guilt beyond a reasonable doubt. *United States v. Saunders*, 973 F.2d 1354, 1360 (7th Cir. 1992) (stating that the jury could rest its findings on the in-court admissions of a coconspirator, even when the coconspirator was a felon, admitted liar, and paid government informant, especially when the testimony, while not corroborated by other witnesses, was supported by additional evidence). In *United States v. Kimoto*, the Seventh Circuit determined that the defendant was essentially arguing that the evidence was insufficient to support a finding of intent to defraud because the testimony of two of his coconspirators should not have been

believed. 588 F.3d 464, 473 (7th Cir. 2010). The court rejected this argument stating that the issue of witness credibility is left to the province of the jury. *Id.* Further, in *United States v. Washington*, the Seventh Circuit affirmed a district court's denial of a RULE 29(c) motion, finding that the testimony of a cooperating coconspirator was sufficient to establish an agreement even when virtually no other evidence linked the defendant to the conspiracy and the coconspirator's testimony was found so incredible as to merit a new trial. 184 F.3d 653, 658 (7th Cir. 1999).

Second, unlike in *Washington*, the government has presented evidence, apart from Suddoth's admissions, upon which a jury could rest a finding beyond a reasonable doubt that the elements of agreement and intent existed in this case. In determining whether the evidence was insufficient so that no reasonable juror could find a defendant guilty beyond a reasonable doubt courts can consider both the direct and circumstantial evidence presented to the jury. *Galati*, 230 F.3d at 258; *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir. 1991) ("Conspiracies, like other crimes, may be proved entirely by circumstantial evidence."). For Section 347 violations, both intent and agreement "may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct." *Cueto*, 151 F.3d at 635.

The following direct and circumstantial evidence of the conspiracy was presented at trial. Co-defendant Suddoth testified that Gray was his partner in a scheme to defraud Indiana Medicaid. (Trial Tr., Suddoth, Vol. 1, 157-58, April 15, 2010.)

Co-defendant Suddoth testified that many of the trips that Dovies billed for were fraudulent because they billed for services that they did not provide. (Trial Tr., Suddoth, Vol. 1, 145.) As a result, there were not records for some of the billed-for trips. (Trial Tr., Suddoth, Vol. 1, 145.) Dovies was audited by Indiana Medicaid in September 2004. (Trial Tr., Lanning, Vol. 1, 78, April 12, 2010.) To cover for the lack of trip tickets, Suddoth told the auditors for the Indiana Medicaid program that the records had been burned in a fire and he testified that he told Gray that he was going to do this. (Trial Tr., Suddoth, Vol. 1, 146.) The auditor, Linda Lanning, also testified that Gray told her that the records had burned in a fire. (Trial Tr., Lanning, Vol. 1.)

Gray testified that, at Suddoth's direction, she drafted the letter to the auditors explaining that the records had burned, signed Suddoth's name to it, and sent it to the auditors. (Trial Tr., Gray, Vol. 4, 156, April 16, 2010.) This letter stated: "Here is the fire incident report that you requested. This was my first office and also my storage space for Dovies Medi-Car Transportation." (Trial Exh., Lanning 1, 45.)

Further, Gray testified that she typed another letter to the auditors for Suddoth. (Trial Tr., Gray, Vol. 4, 158.) This letter stated:

> Unfortunately we were unable to produce any more of the requested information. Because of limited space in our office we had to use an offsite biller. The biller, who has been terminated based on these findings, reported that there was a fire in her home and trip sheets were lost during the fire and after the move to another place. Going forward we will only send copies of the trips to our new biller so that the original is always in our possession.

(Trial Exh., Lanning 1, 42.)

At trial, Gray testified that Suddoth told her that there had been a fire at Janine Bettis's house and that the trip tickets were there. (Trial Tr., Gray, Vol. 4, 156.) She stated that she had no reason to believe that anything in the second letter was not true because she trusted Suddoth. (*Id.* at 156-57.) However, the two letters that Gray wrote appear to contradict each other. One states that the fire was at Suddoth's first office and storage space. The other states that the fire was at the home of a female biller who was terminated. From this inconsistency, a rational jury could find that Gray either knew that a lie was being fabricated or was deliberating attempting to stay ignorant of a lie.

The government presented evidence of increased billing by Dovies occurring during the same time period in which large deposits were made from Dovies into bank accounts to which Gray had access. The government presented evidence, summarized at Trial Exhibits Weston 1c and Weston 1d, that shows the amounts paid to Dovies by Medicaid for basic life support for each month from February 2002 to March 2004 and for transport for each month from March 2002 to September 2004. Basic life support monthly amounts from February 2002 to August 2003 ranged from $40 to $9,596. (Tr. Exh., Weston 1c.) From September 2003 to March 2004, monthly amounts paid were $24,4631, $34,896, $40,118, $57,930, $88,446, $97,658, and $101,924. (Tr. Exh., Weston 1c.) The monthly amounts paid for transportation from March 2002 to December 2003 ranged from $9.50 to $3,196.50. (Tr. Exh., Weston 1d.) For April to August of 2004, the monthly amounts paid were $59,678, $52,395, $55,257, and $46,330. (*Id.*)

Bank account information produced by the government, summarized in Trial Exhibit Blocker 1, and Gray's own testimony showed that she received large sums of money from Dovies during the same time period of the dramatic billing increases. For example, Gray testified that on July 27, 2004, at Suddoth's instruction, she wrote a check for herself for $40,000 from the Dovies TCF account as a bonus for opening Subway and Curves, and that she used this for her personal use. (Trial Tr., Gray, Vol. 4, 147.) Gray further testified that in September 2004 two checks were written to her from the Dovies TCF bank account. (Trial Tr., Gray, Vol. 4, 147-48, April 16, 2010; Trial Exh., Blocker 1; Trial Exh., TCF 2.) One was for $80,000 and had "investment" written in the memo line, and the other was for $50,000 and had "investment/loan" written in the memo line. (Trial Tr., Gray, Vol. 4, 147-48; Trial Exh., Blocker 1; Trial Exh., TCF 2.)

Gray testified that both checks were deposited into the Citibank account, for which Gray was listed as the only account holder, that served as her personal account. (Trial Tr., Gray, Vol. 4, 148.) Gray testified that she used the Citibank account both as her personal account and that she would put money that Suddoth gave her for Curves and Subway into that account. Gray testified that the $50,000 and $80,000 September 2004 checks were for Subway and Curves and that she never used this money for her personal use. (Trial Tr., Gray, Vol. 4, 148.) The check for $50,000 was written two days after Indiana Medicaid began auditing Dovies on September 22, 2004. (Trial Tr., Lanning, Vol. 1, 78-80, April , 2010.) As a result of the audit, on September 27,

2004, Dovies was put on prepayment review and was no longer able to bill only electronically. (Trial Exh., Lanning 1, 36.)

Overall, the summarized bank account evidence provided by the government showed that from February 18, 2004 to September 24, 2004, $194,000 was deposited into the Citibank account from the Dovies TCF account. (Trial Exh., Blocker 1.) From April 2004 to July 2004, an additional $320,000 was deposited into two other accounts to which Wynell Gray was a signatory. (*Id.*)

The circumstantial evidence laid out above shows that as billing for Dovies increased, Gray received contemporaneous checks from the Dovies' account at Suddoth's direction. From Suddoth's testimony and the circumstantial evidence, a rational jury could find beyond a reasonable doubt that Gray entered into an agreement with Suddoth and had the intent to defraud Indiana Medicaid.

b.    *Evidence presented on element of willfulness for Count 2*

Gray argues that no evidence was presented to show that she willfully submitted false billings in violation of 18 U.S.C. § 1347 under Count 2 of the Indictment. (*Id.* at 3.) To prove the crime of fraud, the government must prove that Gray acted "willfully and with specific intent to deceive or cheat." *United States v. Ryan*, 213 F.3d 347, 350 (7th Cir. 2000). Gray argues that the government did not present evidence to show that she intended to submit claims for B. Hawkins in order to deceive Medicaid as Count 2

charges. (*Id.* at 4.) Gray contends that there was no evidence presented that she knew which trips were being provided. (*Id.*)

As Gray points out, in its response the government does not specifically point to evidence showing Gray's knowledge of whether trips were provided for B. Hawkins. (DE # 138 at 13.) Instead the government points to evidence of Gray's motive for fraud, evidence of her role in and admissions of doing the billing for Dovies Medicar, evidence that other people that worked at Dovies knew that it did not have an ambulance, and evidence of Medicaid's policy of not allowing billing for services that are not provided. (DE # 136 at 3-4.)

As stated above, a jury can consider both direct and circumstantial evidence when finding guilt beyond a reasonable doubt. *Townsend,* 924 F.2d at 1390; *United States v. Lucus*, No. 97-2719, 1998 U.S. App. LEXIS 30634, at *8 (7th Cir. Nov. 30, 1998) (unpublished) ("it is hornbook law that the government may prove its case through circumstantial evidence that invites the trier of fact to draw inferences, so long as those inferences are reasonable"). In the case of proving intent to defraud "direct evidence of a defendant's fraudulent intent is typically not available." *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994); *see also United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007) (stating "direct evidence of intent to defraud is rare"). Therefore, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme

was reasonably calculated to deceive persons of ordinary prudence and comprehension." *LeDonne*, 21 F.3d at 1426

Witness testimony and exhibits showed that Gray presented herself as the vice president or co-owner of Dovies. (Trial Tr., Carter, Vol. 3, 75, April 15, 2010.) In her application for a Subway franchise, dated March 5, 2004, Gray stated that she was the Vice President at Dovies. (Trial Ex. Subway 1, Subway Application for Additional Information, 1.) She also stated in the Subway Business Plan Questionnaire that she had management experience from working at Dovies. (Trial Ex. Subway 1, Subway Business Plan Questionnaire, 3.)

The evidence presented at trial showed that Gray submitted Medicaid billing for Dovies. (Trial Tr., Suddoth, Vol. 2, 144, April 13, 2010; Trial Tr., Bettis, Vol. 2, 171, April 13, 2010; Trial Tr. Carter, Vol. 3, 67-68.) Witness Denise Carter stated that Wynell Gray was the exclusive Medicaid biller for Dovies (*id.* at 68), and that Gray did the billing in 2003 and 2004 by picking up the trip tickets, having her husband pick up the tickets, or getting the tickets from Suddoth. (*Id.* at 71.) Gray also testified that she did Medicaid billing for Dovies in 2004. (Trial Tr., Gray, Vol. 4, 150-52, April 16, 2010.) Auditor Linda Lanning testified that Gray told her that she was the biller for Dovies. (Trial Tr., Lanning, Vol. 1, April , 2010.)

Co-defendant Suddoth testified that many of the trips that Dovies billed for were fraudulent because no services were provided. (Trial Tr., Suddoth, Vol. 1, 145.) The

government presented evidence that Dovies billed for approximately 94 trips for B. Hawkins from April 1 to August 13, 2004.[2] (Trial Exh., Weston 7.) This is a substantial number of trips, and it would be reasonable for the jury to infer that someone like Gray who admitted to doing billing for Dovies would have entered some of these claims and would have had some idea of the number of trips claimed. As described in the court's discussion in *part a* above, the government presented evidence that Dovies' billings increased dramatically in September of 2003.

The government presented evidence that beginning in 2003, Gray experienced financial benefits from Dovies. In *part a* above, the court discussed the $194,000 deposited into Gray's Citibank account from the Dovies TCF account. This included a $40,000 bonus in July 2004 that she admitted to spending for her personal use. Additionally, Gray told the jury that she was paid about $2,600 every two weeks by Suddoth starting some time in 2003. (Trial Tr., Gray, Vol. 4, 162.) She also testified that Suddoth paid for her and her husband to go to Jamaica in August 2004 and to go to Philadelphia and San Diego at other times that she could not recall. (*Id.* at 164.)

---

[2] Gray contends that while the government argued that she submitted the false claims in order to pay for two franchises, the bills for B. Hawkins were submitted after the franchises were paid for. (DE # 124 at 4-5.) The court is confused by this argument. Gray, citing to Trial Exhibit Weston 7 states that claims were submitted for Hawkins on July 20, 2004, August 3, 2004, and September 6, 2004, and that the franchises were up and running by July, 2004. (*Id.*) As stated above, Trial Exhibit Weston 7 shows numerous submissions from April 1 to August 13, 2004. Further, Gray herself testified that checks deposited into her Citibank account in September 2004 were to be used for Curves and Subway. (Trial Tr., Gray, Vol. 4, 148.)

During cross-examination, Gray stated that she "did not use any of the money that Randy had given [her] for [her] personal use," (Trial Tr., Gray, Vol. 4, 173-74), and that she did not use the Dovies TCF account for her personal use. (*Id.* at 127-28.) After this Gray admitted that she made or could have made multiple purchases through the Dovies TCF Bank account from March 2004 to October 2004 at Lane Bryant, Pier 1, Eden Salon and Day Spa, and a payment to a school for behavioral science. (*Id.* at 173-75.)

The Seventh Circuit has affirmed findings that the evidence at trial was sufficient to establish the element of intent to defraud in cases similar to the one at hand. In *United States v. Paneras*, the court found that the evidence was "more than adequate to establish the defendant's intent to defraud beyond a reasonable doubt when it showed that the defendant benefitted financially from his relationships with his co-conspirators and the people he defrauded and that these benefits were contemporaneous with misrepresentations he made. 222 F.3d 406, 410 (7th Cir. 2000).

In *United States v. Diaz*, the defendant argued that even if the jury believed that she had taken actions to distribute cocaine, they could not find that she "knowingly and intentionally" acted as part of the conspiracy because "she acted at [her coconspirator's] direction, completely ignorant of her role as a courier in the drug distribution enterprise." 876 F.2d 1344, 1354 (7th Cir. 1989). The defendant testified that she did not know that she had carried cocaine and was only acting pursuant to her coconspirator's directives. *Id.* The Seventh Circuit rejected the defendant's argument because: 1) the jury was not required to accept the defendant's self-serving assertions as true and could

determine credibility as it saw fit; and 2) if the facts indicated that the defendant must have known something, the jury was entitled to find that she did know it beyond a reasonable doubt especially when the element of knowledge can be met by proof of deliberate ignorance. *Id.*

The evidence laid out above would allow a rational jury to find that Gray was guilty beyond a reasonable doubt. As in *Paneras,* intent to defraud here can be established by evidence that Gray financially benefitted from the scheme during a time contemporaneous with misrepresentations that she made to Indiana Medicaid through Dovies billing. From the presented evidence, a jury could conclude that Gray was the biller for Dovies and, therefore, it could infer that she submitted the billings for B. Hawkins. The evidence above could establish that Gray had a fiscal motive for submitting fraudulent bills to Medicaid because she was financially benefitting from the Dovies scheme. While the jury may have been able to find from her testimony that Gray did not know that the billings were fraudulent, that credibility determination is left to their judgment and cannot be disturbed by this court on a motion for acquittal. *Cf. United States v. Roberts,* 534 F.3d 560, 571 (7th Cir. 2008).

In sum, Gray's motion for judgment of acquittal notwithstanding the verdict (DE # 125) will be denied.

**Motion for a New Trial**

## I.  STANDARD OF REVIEW

Under FEDERAL RULE OF CRIMINAL PROCEDURE 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The standard for granting a new trial under RULE 33 is less strenuous than that for an acquittal notwithstanding the verdict. *United States v. Alanis* , 265 F.3d 576, 590 n. 8 (7th Cir. 2001). In ruling on a motion for a new trial, a court does not need to view all evidence in favor of the government, and it can consider the credibility of witnesses and the weight given to evidence. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Still, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). The focus in a motion for a new trial is "whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *Id.*

## II.  ANALYSIS

Gray identifies three grounds under which she should be granted a new trial: 1) the prosecution suppressed material exculpatory evidence in violation of her due process rights; 2) the suppressed evidence constitutes newly discovered evidence that merits a new trial; 3) the prosecution made impermissible arguments depriving Gray of a fair trial. (DE # 124 at 2.)

*a.*        *Suppression of material exculpatory evidence*

In order to establish a *Brady* violation, "a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *Boss v. Pierce,* 263 F.3d 734, 740 (7th Cir. 2001). Evidence was suppressed if "(1) the prosecution failed to disclose evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of due diligence." *United States v. Todd*, 424 F.3d 525, 534 (7th Cir. 2005).

The evidence at issue here is data that shows the dates and times that Dovies submitted billings to Indiana Medicaid. (DE ## 138-1, 141-1.) The prosecution faxed the defense the timestamp data for July 15, 2004 at 8:04 p.m. on April 19, 2010, two days before the end of trial. (DE ## 124 at 4, 124-1.) The information came with a fax cover sheet stating in the comments section: "ICN's for 7-15-2004." (*Id.* at 1.) The pages had two columns, labeled "ICN" and "Date of Submission (MMDDYY.HHMMSS)." (*Id.* at 2.) The prosecution gave the defense timestamp data for July 16, 2004 and December 9, 2005[3] on June 22, 2010. (DE # 138-1.) The data has been maintained by a private entity, Electronic Data Storage Systems ("EDS"). (DE # 124 at 3.)

---

[3] By this time, Dovies was no longer operational. This date is for billing done by Lane Enterprises, and the jury did not find Gray guilty of the counts of the Indictment related to Lane. (DE # 1 at 2-5; DE # 110.) Therefore, this data is not relevant to Gray's motion for a new trial.

The defense asserts, without citation, that during discovery it requested "all underlying data held by Medicaid, including records of the billing date, date of service, date of payment by Medicaid, amount billed, amount paid, and patient identification number." (DE # 124 at 7.) Apparently, after these requests were made, a telephone conference took place with defense counsel, government counsel, the defense's expert, and the government's investigating Medicaid Fraud agents. (DE # 124 at 8.) Afterwards, the defense expert had a second conversation with the Medicaid Fraud agents. (*Id.*) The government has submitted a sworn affidavit from one of these agents stating that at no point during either conversation did the defense ask her or the other agent "to determine if EDS captured and maintained time submission data for the Dovies" claims. (DE # 136-1 at 1.) She also states that "without qualification" at no time before the evening of April 15, 2010, was she aware that EDS captured or maintained records of the time of submissions. (*Id.*) The defense argues that it requested "extensive materials retained by Indiana Medicaid" and that the government "failed to indicate that any other data was kept by EDS but had not been provided to the defense." (DE # 138 at 7.) Gray argues that her requests "should have put the government on notice that the defense was seeking to analyze data held by Indiana Medicaid and that all such data had potential relevance." (*Id.*) Thus, she appears to back away from her assertion that she specifically requested time submission information. She contends that she did not seek any information directly from EDS because the partial disclosure of information misled her to believe that all information had been provided. (*Id.*)

Essentially, Gray argues that the timestamp data was exculpatory evidence because it "establish[es] that billing for Dovies Medicar Transportation was submitted by multiple parties simultaneously." (DE # 124 at 2-3.) Gray states that the government argued at trial that Gray was the sole biller for Dovies' submissions to Indiana Medicaid. (*Id.* at 3.) Gray states that she argued at trial that she had "no idea of the largess and fraud of the Medicaid billing submitted." (*Id.*) She contends that the data establishes that multiple parties submitted Medicaid data for Dovies simultaneously and thus corroborates her theory of defense and testimony, "impeaches the only testimony providing direct evidence of knowledge, and introduces significant doubt regarding the responsibility for submitting data to Indiana Medicaid." (*Id.* at 3.)

In response, the government argues that it did not suppress evidence because EDS was not part of the prosecution team; the prosecution did not know that the evidence was relevant to the trial until the defense revealed its defense strategy in the midst of trial, it then immediately gave that info to the defense, and that the defense could understand it; the defendant could have obtained the evidence through due diligence; and the timestamp data was not clearly favorable to Gray. (DE # 136.) In reply, Gray argues that the government continues to suppress timestamp data for other dates and for almost half of the July 15, 2004 billings; EDS was a government party to the case because it was charged with administering a statute and it performed state actions; the defense did not have time to assess and utilize the July 15, 2004 data; the government did not fully respond to her discovery requests and misled her to believe

that all data from Indiana Medicaid had been provided; and the omission of the data is significant because the other evidence at trial was not overwhelming. (DE # 138.)

As discussed below, the court finds that the timestamp evidence is not material; thus it is not necessary to decide the other issues presented by the parties - whether the government possessed the evidence, whether the defense could have obtained the data through reasonable diligence, and whether the defense had the data in time to make use of it at trial. Briefly, the court notes that there is a serious question as to whether the government can be seen to possess or to have knowledge of evidence in the possession of EDS, a private entity contracting with Indiana Medicaid.

Gray argues that any information in EDS's possession can be imputed to the prosecutor because EDS and members of the government's Medicaid Fraud Control Unit were members of the prosecution team. (DE # 124 at 10.) She further contends that EDS was a government party to the case because it was charged with administering a statute and it performed state actions. (DE # 138.) The government counters that EDS was not part of the prosecution team because it is not a government agency, but a private entity that has a contract with the state of Indiana to process and pay Medicaid claims. (DE # 136 at 7.)

Courts have recognized that the government's responsibility under *Brady* can extend to evidence beyond documents in the possession of the prosecution. *See United States v. Hamilton,* 107 F.3d 499, 509 (7th Cir. 1997). The Supreme Court has held that the prosecution "has a duty to learn of any favorable evidence known to the others acting

on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A prosecutor cannot avoid this duty by keeping herself in ignorance of the evidence, and a prosecutor should stay apprised of information gathered by other government entities that are part of the prosecutorial team. *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). However, the Seventh Circuit has stated that availability of evidence to the prosecution is measured by whether or not the evidence is in the possession of some arm of the state. *Crivens v. Roth*, 172 F.3d 991, 997-998 (7th Cir. 1999). EDS is not an arm of the state.

The defense cites to *United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999), for the proposition that "an entity is a government party for *Brady* purposes when it is 'charged with the administration of a statute and has consulted with the prosecution in a case.'" (DE # 138 at 4.) However, that is a misrepresentation. *Bhutani* states that "if a government agency is charged with the administration of a statute, and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution." 175 F.3d at 577. The first entity in question was the federal Food and Drug Administration ("FDA"), clearly a government agency, and the court in *Bhutani* held that knowledge of information in the FDA's possession can be imputed to the prosecution. *Id.*

The court in *Bhutani* found that the real evidence in question was U.S. Pharmacopeia's (a non-governmental entity) eventual recommendation based on the FDA info. (*Id.*) The court found that although the FDA knew about the underlying data,

it had no idea what U.S. Pharmacopeia was going to recommend. (*Id.*) Thus the FDA was not responsible for disclosing this speculative evidence. The court did not find that the FDA or the prosecution was responsible for asking U.S. Pharmacopeia what data it had or what it would do with the FDA data. *Bhutani* does not address when a private entity can be seen as a government party. In *United States v. Hach*, the Seventh Circuit held that the government has no obligation to seek out exculpatory records from third parties. 162 F.3d 937, 947 (7th Cir. 1998.) It seems likely that EDS would not be considered part of the prosecution team since it is not a government agency but a third-party source to the government. However, as stated above, the court does not have to decide this issue since the evidence in question is not material.

Returning to the issue of materiality, in her motion for a new trial, Gray stresses that the government has a duty "'to disclose any evidence in its possession that is favorable to the defendant.' *United States v. Bhutani*, 175 F.3d. 572, 576 (7th Cir. 1999)." (DE # 124 at 3.) However, the quoted sentence from *Bhutani* continues to state the full standard for the kind of evidence involved in a violation of the Fourteenth Amendment: "Under Brady and its progeny, the government has an affirmative duty to disclose any evidence in its possession that is favorable to the defendant *and is material* to either the issue of guilt or punishment." *Bhutani*, 175 F.3d at 576 (emphasis added); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (stating that the government "has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment").

The Seventh Circuit has stated that *Brady* "does not require the prosecutor to divulge every possible shred of evidence that could conceivably benefit the defendant." *Hamilton,* 107 F.3d at 509. A reasonable *possibility* that evidence would affect the result is insufficient; the movant must show that there was a reasonable *probability* that the evidence in question would have produced a different result. *Stickler v. Greene,* 527 U.S. 263, 291 (1999). In *Ritchie,* the Supreme Court noted that a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ritchie,* 480 U.S. at 57 (internal quotations omitted); *United States v. Kimoto,* 588 F.3d 464, 474 (7th Cir. 2009).

Gray argues that the timestamp data is material because it reveals that she could not have been the only person who billed Indiana Medicaid on behalf of Dovies. (DE # 124 at 11.) She argues that a central theory of her defense was that she was not responsible for entering all of the claims and thus did not have "knowledge of the extent of Medicaid billing done by Dovies Medicar." (*Id.*) She further contends:

> If other parties, unknown to the Defendant, were involved, this would raise significant doubt regarding whether the Defendant was aware of any abnormal billing patterns. Evidence corroborating the Defendant's lack of knowledge also makes a finding that the Defendant took steps to avoid knowledge of the fraud unlikely.

(*Id.*) Gray argues that the timestamp data reveals that multiple parties were submitting the data at the same time because some bills (the defendant points to eight incidents for July 15, 2004) were submitted at the exact same time and some were submitted within seconds of each other. (*Id.* at 12; DE # 124-2.) At trial, the defense presented expert

testimony that it would take a person two to three minutes to enter a single claim. (DE # 124 at 11.) Therefore, it would have taken a single person 70.7 hours to enter all of the claims submitted on July 15, 2004. (Tr. Exh. Miller B5.) The government's expert countered that the data could be entered at the rate of 40 seconds per claim. (DE # 124 at 11.) The defense argues that because of this testimony, the jury was able to find that Gray could have been responsible for all of the Dovies billing. (DE # 124 at 12.)

Gray argues that the timestamp data shows that several claims were submitted into the system with far less time in between them than either expert had said was possible. (*Id.*) On the other hand, she also argues that the timestamp data would substantiate the defense expert's testimony that a biller would take two to three minutes to submit a claim because the timestamp data shows that some claims were submitted two to five minutes apart. (DE # 124 at 13.) Apparently ignoring that much of the time stamp data shows that claims were entered with 40 seconds to a minute-and-a-half between them, Gray argues that the timestamp data presents a pattern of entering some claims with two to five minutes apart and some entered within seconds of each other. (DE # 138 at 2.) She argues that this pattern establishes "[t]he intermittent use of multiple billers" and "calls into question the scope of the Defendant's knowledge." (DE # 138 at 2.) Gray's argument that the jury could find that the timestamp data showed both that the claims were submitted more slowly and more quickly than what the government witness had testified to shows that there is no real reasonable probability as to how a jury would have read the timestamp data.

The court is not persuaded by Gray's arguments that suppression of the timestamp data has a reasonable probability of undermining confidence in the jury's determination of guilt. First, as the government emphasizes, the jury found Gray guilty of conspiracy to defraud Medicaid. (DE # 136 at 17.) The timestamp data does not show that Gray had no part in the conspiracy or did not do any billing for Dovies. Some testimony given at trial indicated that other people did Medicaid billing for Dovies. (*See* Trial Tr., Bettis, Vol. 2, 171) (stating that if there were questions about Medicaid billing, Suddoth would either call Wynell Gray or Wynell Gray's mother.) The defense presented evidence that Suddoth learned how to do the Medicaid billing. (*See* Trial Tr., Dickson, Vol. 4, 14, April 16, 2010) (testifying that she saw Suddoth at one or two different Medicaid training programs that included information on how to do Medicaid coding.) (*See also* Trial Tr., Nash, Vol. 4, 19-20, April 16, 2010) (testifying that he talked to Suddoth about Medicaid billing and what codes to use.)

The possibility that other members of the conspiracy were billing at the same time as Gray would not have mitigated Gray's culpability as part of the conspiracy. For the purpose of determining guilt for conspiracy to defraud, it is does not seem to matter whether or not Gray knew of the full extent of the fraudulent billing. It is enough for the jury to find that Gray knew that any of the Indiana Medicaid billing was fraudulent. The evidence at trial suggested that a large percentage of the bills submitted by Dovies did not have corresponding trip tickets. (*See* Trial Exhs., Lanning 1, 9; Trial Tr., Vol. 1, Lanning, 82-83, 86.))

Second, the timestamp data could possibly have further convinced a jury that Gray could have submitted all of the Indiana Medicaid claims. Gray argues that the timestamp data would have corroborated her argument that she could not have done all of the billing. However, while this conclusion is possible, it is not probable. The parties argued extensively at trial about how long it took for billing submissions to be made. The jury was also presented with evidence of the number of claims submitted on several days. (Trial Exh., Miller B3.) Therefore, the jury was given an indication of the extent of the Medicaid billing. The government's expert stated that billing could be done more quickly than had been presented by the defendant's expert. (Trial Tr., Davidson, Vol. 5, 75-78, April 20, 2010.) He stated that rather than having to fill out the entire claim form every time, a biller could save the data on a form and simply change one or two fields. (*Id.* at 75.) He testified that in using this method, it took him 40 seconds to submit a claim. (*Id.* at 78.)

Gray argues that because the timestamp data shows that some claims were entered at a rate between two to five minutes apart, it would verify that the defendant entered data at a rate slower than 40 seconds per claim. (DE # 138 at 3.) However, some of the timestamp data shows that the claims were entered at a rate comparable to or faster than a rate of 40 seconds between claims. The defense's own analysis of the time stamp data shows that many of the claims were submitted with about 40 seconds to about one-and-a-half minutes between claims. (*See* DE # 124-2.) If the jury received the timestamp data, it may have concluded that more than one person did the billing, but it

may also have concluded that claims could be submitted as quickly or even more quickly than the government expert had stated that he was able to do.

Gray further argues that the timestamp data is material in light of the strength of the government's evidence presented at trial. (DE # 124 at 13.) *See Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001). She argues that the only direct evidence of her guilt came from Suddoth's testimony and that this testimony was contradicted by his own testimony and that of other witnesses. (*Id.*) She also contends that the jury was aware that Suddoth had a strong motive to lie and implicate Gray because of his plea agreement with the government. (*Id.* at 13-14.)

First, as stated earlier, the jury can rest its determination of guilt on both direct and circumstantial evidence. *See Galati*, 230 F.3d at 258. As outlined in this court's discussion of Gray's motion for acquittal notwithstanding the verdict, there was sufficient evidence at trial from which a jury could have found Gray guilty beyond a reasonable doubt.

Second, in ruling on a motion for a new trial, a court can evaluate a jury's credibility determinations. Suddoth's testimony may have been contradicted at trial. However, as the defense points out, the jury was aware of Suddoth's plea agreement with the government. The court sees no reason in this case to disturb the jury's assessment of Suddoth's credibility or its ultimate determination of Gray's guilt.

In sum, there is no showing that the timestamp data had a reasonable probability of changing the verdict. The court finds that the evidence was not material to the issue of Gray's guilt. Therefore, no *Brady* violation occurred that would require a new trial.

       b.      *The timestamp data as newly discovered evidence that would probably result in an acquittal if presented at a new trial*

Gray argues that the timestamp data for all dates besides July 15, 2004 is newly discovered evidence that requires a new trial. (DE # 124 at 15.) Newly discovered evidence requires a new trial when "the evidence (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if presented at a new trial would probably result in acquittal." *United States v. Reyes,* 542 F.3d 588, 595 (7th Cir. 2008) (internal citation omitted). The standard for materiality of newly discovered evidence is the same as the standard for materiality under *Brady* - whether there is a reasonable probability that the evidence would have changed the result at trial. *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007). As discussed in *part b* above, the court finds that the time submission data for July 15, 2004, is not material. This finding extends to the timestamp data for the other dates. Therefore, the timestamp data is not the type of evidence that would require a new trial if newly discovered.

       c.      *Impermissible arguments made by prosecution*

Gray next argues that she was deprived of a fair trial by impermissible arguments made by the prosecutor during closing arguments. (DE # 124 at 16.) A

defendant is entitled to a new trial if the government made improper comments that prejudiced the defendant's right to a fair trial. *United States v. Ferguson*, 935 F.2d 1518, 1530 (7th Cir. 1991). The court must first decide whether the challenged statements in isolation were improper and, if they were, the court must then evaluate the remarks in the context of the entire trial to determine if they deprived the defendant of a fair trial. *Id.* When determining whether the defendant was deprived of a fair trial, the court should consider:

> (1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction.

*United States v. Sandoval-Gomez*, 295 F.3d 757, 763 (7th Cir. 2002) (citing *United States v. Scott*, 267 F.3d 729, 740 (7th Cir. 2001)).

Gray contends that the prosecution made two improper series of remarks during the trial: 1) arguing that Gray was singularly responsible for submitting data to Indiana Medicaid when the prosecution knew that was untrue and 2) suggesting that the defendant was responsible for producing evidence to the jury. (DE # 124 at 17-18.) The first set of remarks includes the prosecution's statements that Gray went "all out" with the billing in 2004, that Gray "stay[ed] up for hours on end to bill nonstop," and that "[s]he's the biller." (*Id.*) Gray argues that these remarks were improper because they "directly contradict[ed]" the timestamp data that the government had in its possession before closing arguments. (*Id.* at 18.)

The first statement in the second set of prosecutorial remarks with which Gray takes issue is the prosecutor's objection that defense counsel made "a misstatement of the law" when the latter stated "[t]he defense does not have to put on a scintilla of evidence." (*Id.* at 18-19.) The court ordered the defense attorney to continue, and defense counsel stated "[t]he burden always stays with the government." (Trial Tr., Vol. 6, 27, April 22, 2010.) The second statement is the prosecutor's statement that "the defendant has no, absolutely no obligation to put on a shred of evidence. But, ladies and gentlem[e]n, the power of subpoena works for them too. They have subpoena power." (*Id.* at 19.) The defense argues that with these remarks, the prosecution understated its duty to provide evidence of guilt beyond a reasonable doubt. (*Id.*)

The government counters that both sets of remarks were not improper. (DE # 136 at 22.) The government states that the evidence supported its statements that Gray was the biller. (*Id.*) The government argues that nothing in the timestamp data reduces Gray's responsibility for the Medicaid billing even if other people also helped with the billing on July 15, 2004. (*Id.*) The government contends that its statement that the defendant had subpoena power was invited by the defense's rhetorical questions in closing as to why several individuals who had received substantial money from Dovies and Lane did not testify at trial. The government further argues that even if both sets of statements were improper, the evidence against the defendant was strong and that any possible prejudice caused by the statements was ameliorated by the court's instructions numbers six and ten and statements the court made to the jury during the trial.

First, neither set of remarks was improper. It is arguable, but not definite, that the timestamp data shows that more than one person billed for Dovies. Even if the timestamp data shows that more than one person billed for Dovies, the prosecutor's statements would not stand in direct contradiction with that showing, and they were still supported by evidence at trial. The prosecutor stated that Gray was the biller, that she went all out with the billing, and that she stayed up "for all hours" on July 15, 2004, to bill nonstop. As noted earlier in the court's discussion of the motion for acquittal notwithstanding the verdict, witness testimony showed that people identified Gray as the biller and that she held herself out as the biller to auditor Linda Lanning. The timestamp data itself shows that bills were being submitted until 10:30 p.m. (DE # 124-2 at 16.) Further, one of the defense's witnesses, Kelli Beatrice Kemp answered "yes" to the prosecutor's question, "Do you recall making a statement in November, 2009, stating that you remember conversations with Wynell about doing billing for Dovies late at night after she spent hours at Curves?" (Trial Tr., Kemp, Vol. 4, 35, April 16, 2010.) During redirect examination, Ms. Kemp stated that she remembered Gray telling her that "when she got done working at Subway, she would do some billing for Randy." (*Id.* at 36.) Thus the prosecutorial statements do not directly contradict the timestamp data and are supported by other evidence presented at trial.

The case that the defense relies upon to show that these statements are improper, *United States v. Reyes*, is readily distinguishable from the one at hand. 577 F.3d 1069 (9th Cir. 2009). In *Reyes*, a key issue was whether the defendant knew that corporate

records under-reported the company's expenses. *Id.* at 1076. The defendant argued that he thought that the records were correct and that he relied on the company's Finance Department to comply with accounting principles and SEC regulations. *Id.* Finance Department executives had made statements to the FBI that they knew that the records were reporting data incorrectly and that one employee had resigned because of that. *Id.* One low-level Finance Department employee, Elizabeth Moore, stated that she did not know anything about the under-reporting. In closing arguments, the prosecution stated: "finance did not know anything. . . . Our theory is that those people didn't know anything . . . . Elizabeth Moore says finance didn't know. Did you need everybody in the finance department to come and tell you that they didn't know?" *Id.* at 1076-77.

The Ninth Circuit determined that in making these statements, "[t]he prosecutor asserted as fact a proposition that he knew was contradicted by evidence not presented to the jury." The court found that it is improper for the prosecution "to present to the jury statements or inferences it knows to be false or has very strong reason to doubt." *Id.* However, as explained above, this did not happen in the case at hand because the timestamp data does not clearly show that more than one person billed for Dovies and, while the prosecutor called Gray "the biller," she did not state that Gray was the only person who ever did billing for Dovies. The government also produced evidence that showed Gray had referred to herself as the biller.

The prosecutor's statements about the defense's subpoena power were also not improper. Immediately before she mentioned the defense's subpoena power, the

prosecutor emphasized that Gray had no burden of proof in the trial. As the court will discuss further below, it is not improper for a prosecutor to state to a jury that the defendant also has subpoena power when the defense has opened the door to this argument, especially when the prosecution has clarified that the defendant does not have the burden of proof. *United States v. Aldaco*, 201 F.3d 979, 988-89 (7th Cir. 2000) ("We hold that it was not improper for the prosecutor to make clear to the jury that the defendant, like the government, has the power to subpoena any witness or witnesses relevant to the case after Aldaco's counsel had opened the door to this reply argument by the prosecution.").

Second, even if the statements were improper, the court minimized any possible prejudice to the defendant through its jury instructions and other verbal instructions to the jury. Court instruction six including the following statement:

> [T]he lawyers' statements to you are not evidence. The purpose of these statements is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

(Trial Tr., Vol. 6, 49, April 21, 2010.) During closing arguments the prosecution was discussing checks Gray received during the course of the Lane enterprise and Gray's "abandonment" of Curves. (*Id.* at 18.) Defense counsel objected that the prosecution misstated the facts. (*Id.*) In response the court stated:

> What I'm going to do is, again, instruct you that what these lawyers say is not evidence; and you will disregard what they say unless it is what was presented here in court during the presentation of evidence phase.

(*Id.*) Shortly after this re-clarification, the prosecution twice argued that Gray was the biller. (*Id.* at 18, 21.)

Later in closing arguments the prosecution objected that the defense misstated the amount of restitution to be paid by Suddoth. The court warned:

> [A]gain, what these lawyers say in their final argument, that's not evidence. And you'll disregard what they say unless it's supported by the evidence that you saw and heard during the presentation evidence phase of the case.

(*Id.* at 41.)

The court's jury instruction number ten addressed the issue of the defendant's burden of proof:

> The defendant is presumed to be innocent of each of the charges. This presumption continues during every stage of the trial and your deliberations on the verdicts. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty as charged. The government has the burden of proving the guilt of the defendant beyond a reasonable doubt.
>
> This burden of proof stays with the government throughout the case. The defendant is never required to prove her innocence or to produce any evidence at all.

(Trial Tr., Vol. 6, 50.) This statement clarified that the government had the burden of proof throughout the trial and ameliorated any potential prejudice caused by the prosecution's objection to defense counsel's statement that the defense did not have to produce a scintilla of evidence.

Third, the prosecution's statements about the defense's subpoena power was invited by the defense. Under the "invited response doctrine," even if a statement is

improper, it still may not have resulted in an unfair trial if it was made in response to provocation from the defense. *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir. 1987). The invited response doctrine does not give the prosecution permission to make improper arguments. *United States v. Young*, 470 U.S. 1, 12 (1985). Instead the court should focus on whether "the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." In doing so, the court should look at the defense's statements to evaluate whether "the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,'" in which case the comments do not require reversal of a conviction. *Id.* at 12-13.

As the government points out, during closing arguments, the defense stressed that the government had not called as witnesses several people who had also received checks from Dovies. In her closing argument, defense counsel argued that "one of the things the government's completely skipped over in this case and has not even talked about today" was Suddoth's wife, Nicole Burrage. (Tr. Vol. 6, at 27-28.) Defense counsel asked, "Where is Nicole Burrage, ladies and gentlemen?" (*Id.* at 28.) Defense counsel continued to state that Suddoth's sister and mother also received checks of $100,000 or more from Dovies. (*Id.*) She again asked the jury where these two witnesses were. (*Id.*) It was in response to these arguments that the government referenced the defense's subpoena power.

Similarly, in *United States v. King,* the defense argued that the prosecution's failure to produce certain officers who had taken eye-witnesses' statements called into

question the reliability of those statements. 150 F.3d 644, 647-48 (7th Cir. 1998). In

response, the government argued:

> 'The law in this case is that even though the defendant has no obligation to prove anything, he has the opportunity to subpoena witnesses, just as well as the Government. The defendant can call witnesses, or not, and you can draw the inference from the fact that he didn't call the agents, ladies and gentlemen, but the agents–' . . . 'I'll repeat for the jury, he has no obligation to call anyone, but he has an opportunity to call them, ladies and gentlemen.'

*Id.* at 648.

In *King* the court not only held that these statements were invited by the defense,

but also that they were not even improper:

> In a case like this where the defendant himself has broached the subject of missing witnesses by asking the jury to in a sense penalize the government for its failure to produce the agents, the prosecutor's argument in response clearly was proper.

Contrary to Gray's arguments, in finding that the prosecutor's comments did not

warrant a new trial, the Seventh Circuit seemed not to emphasize the warnings given by

the prosecution as much as it did that the comments did not alter the burden of proof.

*Id.* at 649. The court stated: "the prosecutor's observation that the defense could

produce a certain witness or witnesses if it wished neither alters the burden of proof nor

penalizes the exercise of a constitutional right. . . . Rather, the argument merely conveys

information that 'the jury is entitled to know.'" *Id.* (citing *United States v. Sblendorio*,

830 F.2d 1382, 1393 (7th Cir. 1987), *cert. denied*, 484 U.S. 1068 (1988)). Similarly, here the

prosecutor was simply responding to the defense's argument about missing witnesses.

Thus, the prosecutorial statements do not support a finding that the trial was unfair.

For the reasons discussed above, the court **DENIES** Gray's motion for a judgment of acquittal notwithstanding the verdict. (DE # 125.) The court also **DENIES** Gray's motion for a new trial. (DE # 124.)

**SO ORDERED.**

Date: August 11, 2010

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT