# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 2:07 CR 166 |
| WYNELL GRAY | ) | |

## OPINION AND ORDER

Defendant Wynell Gray has filed a motion requesting that this court order her release on bond pending her appeal. (DE # 170.) The government filed a response in opposition (DE # 177), and Gray filed a reply. (DE # 178.) For the reasons given below, this motion will be **denied**.

## I.    BACKGROUND

The following is a brief overview of the case. Gray and her co-defendant, Randy Suddoth, were charged with conspiracy to defraud the Indiana Medicaid Program in violation of 18 U.S.C. § 371 by submitting fraudulent billings to Indiana Medicaid on behalf of Dovies Medicar Transportation ("Dovies") (Count 1) and on behalf of Lane Medical Transportation ("Lane") (Count 3). (DE # 1 at 2, 5.) Count 2 of the Indictment charged defendants with executing a scheme to defraud the Indiana Medicaid Program in violation of 18 U.S.C. § 1347 by submitting fraudulent billings for Dovies from April to August of 2004 on behalf of B. Hawkins. (*Id.* at 4.) Counts 4, 5, 6, 7, 8, 9 and 10 charged defendants with executing a scheme to defraud through the operation of Lane. (*Id.* at 7-13.) Suddoth pleaded guilty to Count 3 of the Indictment. (DE # 29.) A jury found Gray guilty of Counts 1 and 2. (DE # 114.) Gray was sentenced to a term of imprisonment of 33 months followed by three years of supervised release.

(DE # 167 at 2-3.) She is scheduled to begin serving her term of imprisonment on February 1, 2011. (*Id.*)

## II.    STANDARD OF REVIEW

Pursuant to 18 U.S.C. § 3143, a defendant can be released on bond pending appeal if a judicial officer finds 1) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community, and 2) that the appeal is "not for the purpose of delay and raises a substantial question of law or fact likely to result in" i) reversal, ii) an order for a new trial, iii) a sentence that does not include a term of imprisonment, or iv) "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

## III.    ANALYSIS

To begin, the parties agree that Gray is unlikely to flee and does not pose a danger to her community. (DE # 177 at 1.) For the sentencing hearing, the defense presented evidence of Gray's employment in the community. (DE ## 157, 156-2 at 1-4; Presentence Investigation Report ("PSR") ¶ 61.) The defense also submitted thirty-seven letters of support from Gray's friends, family members, and co-workers that evince strong ties to the community. (DE ## 156, 159; *see also* PSR ¶¶ 46, 49, 50.) Further, Gray's probation officer found that Gray had strong family ties. (PSR ¶ 92.) Gray was not convicted of a violent crime and has no criminal history. (PSR ¶ 42.) Gray's probation officer reported that Gray did not violate her supervision on bond during the time before her trial and supervision. (PSR ¶ 10.) It follows that the court finds by clear

2

and convincing evidence that Gray does not present a flight risk or a danger to the community. There has also not been any charge that the appeal will be raised for the purpose of delay.

Accordingly, the focus of this decision is whether Gray's proposed appeal will raise a substantial question of law or fact that is likely to result in a new trial or reversal. The court must first decide if a proposed argument raises a "substantial question" of law or fact. Under Seventh Circuit case law interpreting Section 3143(b), a "substantial question" is one that can be described as "a toss up or nearly so," "a close question," or "one that could be decided the other way." *United States v. Shoffner,* 791 F.2d 586, 589 (7th Cir. 1986); *United States v. Greenberg,* 772 F.2d 340, 341 (7th Cir. 1985); *United States v. Inks,* 670 F. Supp. 829, 830 (N.D. Ill. 1987). If the court finds that an argument raises a substantial question it must then decide whether the question is one that is "so integral to the merits" that if it was decided in the defendant's favor, the appellate court is more likely than not to reverse the conviction or order a new trial. *United States v. Bilanzich,* 771 F.2d 292, 298-299 (7th Cir. 1985) ("whether a question is 'substantial' defines the *level of merit* required in the question presented and 'likely to result in reversal or an order for a new trial' defines the *type of question* that must be presented") (emphasis in original) (internal quotations omitted).

Gray points to three legal arguments that she will make on appeal that she contends present substantial questions of law or fact. (DE # 170 at 3-4.) These arguments are: 1) the ostrich instruction was improperly included in the definition of

knowledge given to the jury; 2) Gray's specific theory of defense instruction was improperly excluded from the instructions given to the jury; and 3) the government committed a *Brady* violation by not remitting all data regarding the timing of billing for Dovies at an earlier date than two days before the end of trial. The court will now analyze whether each of these arguments presents a substantial question of law or fact.

    *a.*    *Ostrich instruction*

Court's Instruction Number 17 defined "knowingly" to include purposeful avoidance. In comport with Seventh Circuit Pattern Jury Instruction 4.06, the instruction read:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that the defendant had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet she shut her eyes for fear of what she would learn, you may conclude that she acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if she was merely negligent in not discovering the truth.

This instruction is commonly referred to as the "ostrich instruction," and it informs the jury that "it may look at a charade of ignorance as circumstantial proof of knowledge." *United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993). Gray does not contest the formulation of the instruction; rather she argues that it was not appropriate to give this instruction in her case.

Inclusion of the ostrich instruction is only appropriate when "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *United States v. Herrero,* 893 F.2d 1512, 1538

4

(7th Cir. 1990) (internal quotations omitted). In determining whether the ostrich instruction was appropriate, an appellate court will review all of the "evidence and any reasonable inference from that evidence in the light most favorable to the government." *United States v. Talkington*, 875 F.2d 591, 596 (7th Cir. 1989).

The effort to avoid guilty knowledge through deliberate ignorance can be either physical or mental by a cutting off of one's normal curiosity by an effort of will. *United States v. Giovannetti*, 919 F.2d 1223, 1227-29 (7th Cir. 1990). In the latter situation:

> There is no need to search in vain for an "act" that occurred in the veiled isolation of a defendant's psyche. The focus is on what the defendant knew and whether the defendant knew enough to support an inference that he or she remained deliberately ignorant of facts constituting criminal knowledge.

*United States v. Carrillo,* 435 F.3d 767, 781 (7th Cir. 2006). A finding of psychological avoidance may be particularly likely in a case in which "circumstantial evidence suggests that the defendant possessed enough information to prompt further investigation, but he did not delve for fear of what he might learn." *United States v. Stone,* 987 F.2d 469, 472 (7th Cir. 1993). The Seventh Circuit has repeatedly stated that ostrich instructions are "principally employed" in situations, like the one at hand, in which there is evidence that a defendant is associated with a group and was consciously avoiding knowledge of the group's illegal activity, and the defendant acknowledged his association with the group but denied knowledge of its illegal activity. *Herrero,* 893 F.2d at 1538 (internal quotations omitted).

5

Gray argues that "the propriety of this instruction was not clear" in her case because it was "not clear what evidence suggested Mrs. Gray's deliberate avoidance of knowledge." (DE # 170 at 4; DE # 178 at 2.) As described more thoroughly below, Gray's theory of defense was that she did not knowingly submit inaccurate data to Medicaid because she simply billed for Dovies as directed by Suddoth and had no independent knowledge of the Medicaid billing codes. Gray points to two pieces of evidence that the government argued could support a finding that Gray had taken steps to avoid knowledge of Dovies' illegal billing: 1) that Medicaid providers had a duty to learn to bill for Medicaid correctly, and 2) that on days of high billing, Gray must have had a suspicion that the services being billed were not provided. (DE # 170 at 4-5.) She argues that neither of these pieces of evidence can support an inference of deliberate ignorance because they were called into question during trial. First, she argues that her duty to learn Medicaid billing was contested at trial and that a failure to fulfill that duty would constitute negligence, not criminal action. (*Id.* at 5.) Second, she argues that she testified at trial that she had no knowledge of the high volume of billing. (*Id.*)

As will be explained, the inclusion of the ostrich instruction in this case does not present a substantial question for appeal because Gray claimed a lack of guilty knowledge and there were multiple pieces of evidence presented at trial that supported an inference of deliberate ignorance. It is clear that Gray claims to have no guilty knowledge. (*See e.g.*, Trial Tr., Vol. 4, 108-09.) So the court's analysis will focus on the

second prong for the propriety of the ostrich instruction - whether the evidence supported an inference of deliberate indifference.

Although Gray points to two pieces of evidence that the government used to support a finding of deliberate indifference, at trial the court stated that these two pieces of evidence were just part of the reason why the ostrich instruction was appropriate. (Trial Tr., Vol. 5, 109.) What follows is a non-exhaustive account of the evidence presented at trial, viewed in the light most favorable to the government as required, that supports an inference that Gray purposely avoided knowledge of the illegal activity undertaken through Dovies.

First, the evidence showed that Indiana Medicaid providers had a duty to learn the proper billing codes. Gray argues that she was just a biller for Dovies, so she did not have a duty to learn the codes. (Trial Tr., Vol. 5, 110.) However, the government provided evidence that Gray was the vice president or co-owner of Dovies. (Trial Tr., Carter, Vol. 3, 75.) In her application for a Subway franchise, dated March 5, 2004, Gray stated that she was the Vice President of Dovies. (Gov.'s Exh. Subway 1, Subway Application for Additional Information, 1.) She stated that she had management experience from working at Dovies. (*Id.*, Subway Business Plan Questionnaire, 3.) There was also evidence presented at trial that Gray had management duties for Dovies. For example, as explained below, there was evidence that Gray was in charge of Medicaid billing for Dovies and that she had access to Dovies' bank account and wrote sizeable checks from that account. This evidence could support a finding that Gray had a

leadership role in Dovies and control over the fraudulent claims submitted to the government, yet she failed to ask questions about the billing process. Evidence of this type can support an inference of deliberate indifference. *Cf. United States v. Craig*, 178 F.3d 891, 898 (7th Cir. 1999) (finding that the propriety of the ostrich instruction was supported by evidence that the defendant acted like a manager in the company used to perpetrate the fraud and handled the fraudulent documents that were submitted to the government).

There was evidence at trial that Gray received some education about the Medicaid billing codes. Gray testified that she was present at meetings concerning Medicaid billing and was directed to the manual as a resource for billing. (Trial Tr., Gray, Vol. 4., 106.) She also testified that she filled out the provider enrollment agreement and the provider update form for Dovies. (*Id.* at 93, 95.) The government's witness testified that the provider enrollment agreement explained that providers had a duty to stay knowledgeable of the Medicaid guidelines and to submit accurate, legitimate claims. (Trial Tr., Davidson, Vol. 2, 243; Gov.'s Exh. Davidson 3.) He also testified Indiana Medicaid providers had hard-copy and online resources, as well as a written question and answer process, available to them to learn proper billing. (Trial Tr., Davidson, Vol. 2, 214, 244.) The provider update form also included a certification statement for providers submitting claims that explained that all claims submitted should be true, accurate, and complete. (Gov.'s Exh. Davidson 3.) Therefore, the evidence, viewed in the light most favorable to the government, could support an

inference that Gray had a leadership role in Dovies, knowledge of Dovies' duty to bill Medicaid properly, and access to information about the proper billing codes.

Gray argues that even if she had a duty to learn the Medicaid billing codes, her failure to do so constituted negligence, not criminal action. First, the court notes that its instruction specifically informed the jurors that they could not conclude that Gray acted knowingly if they found that she was negligent in not discovering the truth. Second, the evidence that Gray knew that Dovies had a duty to bill correctly, but avoided knowledge of whether the billing she was doing was legitimate, supported an inference of deliberate action. In *United States v. Nazon*, the Seventh Circuit held that a defendant acted with deliberate indifference, so as to reach the level of having acted "knowingly," when he had a duty to learn Medicaid codes but failed to do so. 940 F.2d 255, 260 (7th Cir. 1991) (finding that the defendant doctor's "deliberate avoidance of familiarizing himself with the rules, conditions, and law controlling his claim submissions. . . in conjunction with his 'no guilty knowledge' defense, is strong grounds to offer a 'conscious avoidance' instruction"); *see also United States v. Lennartz*, 948 F.2d 363, 369-70 (7th Cir. 1991).

As was the case in *Nazon*, the evidence here showed that Gray knew that Dovies had a duty to bill Medicaid correctly because she completed the enrollment agreement and provider update form for Dovies that outlined this obligation. Rather than investigating whether or not the billing was done correctly, she relied only on Suddoth's instruction as to how to bill.

9

Gray's failure to investigate the propriety of the billing codes appears particularly questionable in light of the drastic increase in the number of claims submitted by Dovies and the amount of revenue from billing. Evidence at trial showed the high volume of billings on certain days and the great increase in the revenue from billings. (Trial. Tr., Miller, Vol. 5, 37; Gov.'s Exh., Weston 1d.) Evidence at trial showed that Gray was responsible for the Medicaid billing for Dovies. Suddoth, Carter, and Bettis testified at length that Gray was responsible for the billing. (Trial Tr., Suddoth, Vol. 1, pgs. 139, 151; Trial Tr., Suddoth, Vol. 2, pgs. 129, 144, 161; Trial Tr., Bettis, Vol. 2, 171; Trial Tr., Carter, Vol. 3, 67-68.) Carter stated that Gray was the exclusive Medicaid biller for Dovies. (*Id.* at 68.) Gray also testified that she did Medicaid billing for Dovies. (Trial Tr., Gray, Vol. 4, 150-52.) Auditor Linda Lanning testified that Gray told her that she was the biller for Dovies. (Trial Tr., Lanning, Vol. 1, 85.) From this evidence, the jury could have inferred that because Gray was in charge of the billing for Dovies, she would have been aware of the extent of the billing.

Even if the jury chose to believe Gray's testimony that she did not have knowledge of the full volume of Dovies' billing (Trial Tr., Gray, Vol. 5, 140), the government presented extensive evidence that Gray was aware of the financial gains generated by Dovies' fraudulent billing. The evidence showed that Dovies' non-ambulance billings went from an average of $405 per month in 2003 to $56,585 per month in 2004. (Gov.'s Exh, Weston 1d.) The government also presented evidence, that the amount paid to Dovies for ambulance billings went from an average of $5,524 per

month from February, 2002, to August, 2003, to an average of $63,657 from September, 2003, to March, 2004. (Gov.'s Exh., Weston 1c.) In March, 2004, alone, Dovies billed $101,924 for ambulance services. (*Id.*)

At trial, Gray testified that when Dovies began, Suddoth told her that he would not be able to pay her until the company started making money. (Trial Tr., Gray, Vol. 4, 97.) She testified that she started working for Dovies in February, 2002, and did not get paid anything until sometime in 2003. (Trial Tr., Gray, Vol. 4, 98, 104.) She testified that in 2003, she earned $50,000 from her work at Dovies. (*Id.* at 161-62.) The government presented evidence that the increased billing by Dovies occurred during the same time period in which large deposits were made from Dovies into bank accounts to which Gray had access.

Gray testified that she was aware of many of the substantial checks written from the Dovies' bank account into accounts to which she had access beginning in February, 2004. Gray testified that Suddoth told her that he had "saved up money" and wanted to purchase franchises, that she helped him to start these franchises, and that she was aware that the significant purchase prices of these franchises were paid from the Dovies' bank account. (Trial Tr., Gray, Vol. 3., 111.) Gray testified that she knew a $12,000 check and a $15,000 check were written from the Dovies' bank account for the purchase of the Curves franchise in February, 2004. (*Id.* at 127-31.) She also testified that a $12,000 check was written from the Dovies' account for remodeling of the Curves in March, 2004. (*Id.* at 132.) Then she testified that in April, 2004, she wrote a $60,000 check

11

from the Dovies bank account that was used for Subway. (*Id.* at 136.) She testified that at Suddoth's direction, she wrote herself a bonus check for $40,000 from the Dovies' bank account for opening the Subway and Curves franchises in July, 2004. (*Id.* at 147.) She also testified that two checks of $50,000 and $80,000 were written from Dovies' account to be put into her account for use for Subway and Curves. (*Id.* at 147-48.) The check for $50,000 was written two days after Indiana Medicaid began auditing Dovies on September 22, 2004. (Trial Tr., Lanning, Vol. 1, 78-80.)

In sum, this evidence shows that Gray was aware that Dovies suddenly progressed from generating so little money that she could not be paid anything in 2002, to generating at least $269,000 of income in about seven months in 2004 that could be directed away from Dovies' operations. A jury could infer that the availability of large amounts of cash from Dovies indicated that the company did not have costs corresponding to what it billed. A jury could also conclude that Gray's knowledge of this huge influx of cash from Dovies should have raised her suspicion that something might not be right with the billings. *Cf. United States v. Broeske*, 178 F.3d 887, 890 (7th Cir. 1999) (finding that the defendant's suspicion should have been raised when her sister suddenly acquired a "large sum of money," $900, in fifty dollar bills); *United States v. Graffia,* 120 F.3d 706, 713 (7th Cir. 1997) (finding that the defendants should have been prompted to investigate the legitimacy of a bank when the initial balance sheet for the bank listed "$4 billion in assets and only $43,000 in liabilities"). This evidence could support a finding that Gray was aware that something unusual was

occurring with Dovies' Medicaid billing but she failed to investigate for fear of what she would learn.

Fourth, the government presented evidence that Gray continued to take actions that supported the Dovies scheme to defraud even after she was aware that the billing was inaccurate. Indiana Medicaid undertook an audit of Dovies in response to the company's billing patterns. Gray testified that when Suddoth told her about the audit, he told her that Indiana Medicaid said that Dovies was billing the wrong codes. (Trial Tr., Gray, Vol. 4, 109.)

Gray testified that a few days later Suddoth called her and told her that he could not locate all of the trip tickets requested by Indiana Medicaid because they had been burned in a fire at the home of his ex-wife, Jeannine Bettis. (Trial Tr., Gray, Vol. 4, 156.) Gray testified that, at Suddoth's direction, she drafted a letter to the auditors explaining that the records had burned, signed Suddoth's name to it, and sent it to the auditors. (Trial Tr., Gray, Vol. 4, 156.) In this letter, Gray attached the fire incident report and stated: "Here is the fire incident report that you requested. This was my first office and also my storage space for Dovies Medi-Car Transportation." (Gov.'s Exh., Lanning 1, 45.) Gray stated that she had no reason to believe that anything in the letter was not true because she trusted Suddoth. ((Trial Tr., Gray, Vol. 4, 156-57.)

Gray testified that she typed a second letter to the auditors for Suddoth. (Trial Tr., Gray, Vol. 4, 158.) She testified that Suddoth wrote the substance of the letter and then she re-typed to make it sound more professional. In that letter she typed that

13

Dovies had to use an offsite biller, that the fire took place in this person's home, and that the biller had been terminated. (Gov.'s Exh., Lanning 1, 42.) She then signed the letter with Suddoth's name and sent it to "who he asked [her] to send it to." (Trial Tr., Gray, Vol. 4, 158.) Accordingly, Gray admitted that she wrote and sent two contradictory letters to the auditors about the fire. One stated that the fire was at Suddoth's office and storage space and the other that it occurred at the home of a terminated female biller. Further, Gray testified that she was told that the fire took place at neither of these places, but at Jeannine Bettis's house. (Trial Tr., Gray, Vol. 4, 156.) There was also no evidence at trial that there was ever an offsite biller who was terminated. Thus the letters that Gray typed and sent to the auditors contained both inconsistent information and information that Gray should have suspected was untrue. Yet, she claimed that she had no reason to question what was in the letters because she trusted Suddoth. From this inconsistency, a rational jury could find that Gray "must have forced her suspicions aside and deliberately avoided confirming that she was engaged in criminal activity." *United States v. Garcia,* 580 F.3d 528, 537 (7th Cir. 2009); *see e.g., United States v. Neville*, 82 F.3d 750, 760 (7th Cir. 1996) (finding that the defendant's failure to question patently false letters could support a claim of deliberate indifference).

Fifth, even after Gray was aware of the audit and the contradictory letters, there was no evidence that Gray asked questions about the audit or how to bill properly. She testified that she asked Suddoth how the audit went, that he told her that it was fine

14

and that the auditors said Dovies was using the wrong codes, and "that's it" as far as their discussion of the audit. (Trial Tr., Gray, Vol. 4, 117.) In fact, Gray testified that after the audit had been completed, Suddoth gave her new codes to use, and she did not investigate the accuracy of these codes. (Trial Tr., Gray, Vol. 4, 117.) At this point, Gray had been put on notice that there were questions about Dovies' billing, yet she testified that she continued to rely on Suddoth's interpretation of the codes. She testified generally that when Suddoth asked her to write checks and put money in different accounts, she had "no reason to think about whether" she should question this. (*Id.* at 195.) She testified that she just worked for Suddoth and trusted him as her friend so she did not ask any questions. (*Id.*) Viewed in the light most favorable to the government, this type of evidence can support an inference that Gray intentionally closed her eyes to the illegal billing. *United States v. Leahy,* 464 F.3d 773, 796 (7th Cir. 2006) (finding that the defendant's failure to ask questions about audit problems was evidence of active avoidance of the truth); *Craig*, 178 F.3d at 897-98 (stating that the failure to ask questions that would naturally arise from the circumstances can be taken as evidence of efforts to avoid the truth).

The defense argues that the evidence presented at trial showed only direct knowledge of the criminal venture. (DE # 178 at 2.) However, this argument is unavailing. The government was not required to choose between arguing direct knowledge and arguing deliberate indifference and could present the same evidence in support of both theories. *United States v. Ramirez*, 574 F.3d 869, 879 (7th Cir. 2009);

*United States v. Carillo,* 435 F.3d 767, 784 (7th Cir. 2006). The government did present evidence of direct knowledge. Still, as outlined above there was extensive evidence presented at trial that Gray deliberately took steps to avoid knowledge of Dovies' illegal billing. Because of the many pieces of evidence supporting an inference of deliberate indifference, the inclusion of the ostrich instruction does not present a substantial question for appeal.

  b. *Gray's theory of defense instruction*

  Gray argues that she was entitled to have her theory of defense instruction, Defendant's Proposed Instruction 17, submitted to the jury because she met the requirements set forth in *United States v. Fiore*, 178 F.3d 917, 922 (7th Cir. 1999), and stated below. (DE # 170 at 5.) She also argues that "[w]hether the failure to give this defense instruction misled the jury regarding the requisite knowledge is a substantial question of law." (*Id.* at 6.) She contends that the risk of confusion about the *mens rea* requirement presented by the failure to submit this instruction to the jury was "heightened by the use of the ostrich instruction." (*Id.*)

  In response, the government argues that no error was committed when the court declined to submit Defendant's Instruction 17 to the jury because the defendant's theory of the case was covered by the good faith instruction given to the jury, Court's Instruction Number 31. (DE # 177 at 2-3.) The government also argues that while Gray purported that her theory of defense instruction was based on Seventh Circuit Pattern

16

Jury Instruction Number 4.06, her instruction was not a "complete and accurate recitation of the pattern instruction." (*Id.* at 2.)

A defendant is entitled to an instruction on her theory of defense if 1) the defendant proposes a correct statement of the law; 2) the defendant's theory is supported by the evidence; 3) the defendant's theory of defense is not part of the charge already given to the jury in the court's instructions; and 4) the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial. *United States v. Douglas,* 818 F.2d 1317, 1320-21 (7th Cir. 1987). As the court stated during the trial, Gray's proposed instruction did not meet the first or third elements of this test. (Trial Tr., Vol. 5., 115-19.)

First, Gray's proposed instruction misstated the government's burden in this case. Gray's proposed jury instruction read as follows:

> If you find that Wynell Gray acted through ignorance, mistake or accident, you should find her not guilty. This means that you may find that Wynell Gray input[ted] inaccurate data and submitted that data to Indiana Medicaid, but still find her not guilty. You should do so if you find that she submitted that data mistaking it as accurate or without knowingly and willfully intending to submit inaccurate data.

(DE # 100 at 3.) In her submission of her proposed jury instructions, Gray made the following citations to support this instruction: "*See* 7th Circuit Pattern Instruction 4.06; *United States v. Douglas*, 818 F.2d 1317, 1320-21 (7th Cir. 1987) (noting that the defense is entitled to a theory of defense instruction)." *(Id.)* Gray's proposed instruction did not restate the language in Pattern Jury Instruction 4.06. Instead Gray's instruction tailored

17

the instruction to specific facts of her charged crime. Gray's version of this instruction was problematic. It stated that if the jury finds that Gray submitted inaccurate data to Indiana Medicaid "mistaking it as accurate or without knowingly and willfully intending to submit inaccurate data," then it should find her not guilty. The instruction seemed to indicate that a finding of "knowingly" was only necessary for the act of inputting and submitting the data to Medicaid. This was not the case. The government needed to prove that Gray acted knowingly in other contexts, such as knowingly entering the conspiracy. It was also possible that even if the jury found that Gray mistakenly entered the data, it could have found her guilty if it found that she knowingly participated in other parts of the scheme to defraud Medicaid by, for example, knowingly helping Dovies to evade the audit or knowingly accepting illegally-obtained funds from the conspiracy. Thus, Gray's proposed instruction misstated the law by focusing the "knowingly" finding on only one aspect of the scheme to defraud.

Second, as explained below, Gray's proposed theory of defense was covered within the complete set of instructions given to the jury. A defendant is not entitled to have her particular instruction presented to the jury; rather she is entitled only to have her theory of defense presented to the jury. *Douglas,* 818 F.2d at 1320-21. *United States v. Pritchard*, 458 F.2d 1036, 1040 (7th Cir. 1972), *cert. denied*, 407 U.S. 911 (1972) ( "[W]here the jury is fully and fairly instructed upon the case as a whole it is unnecessary to give any specific instruction in the precise form requested by the defendant."). Because a

18

judge has substantial discretion over the specific writing of an instruction, the court's instructions are sufficient if they cover the "essential points" of the defendant's theory of defense. *United States v. Wiszowaty*, 506 F.3d 537, 541 (7th Cir. 2007) (quoting *United States v. Rice*, 995 F.2d 719, 724 (7th Cir. 1993)). The sufficiency of jury instructions is evaluated by examining the entire charge given to the jury in the context of the overall trial. *Herrero*, 893 F.2d at 1536. The Seventh Circuit has found that trial judges have acted within their discretion when their attempts to modify instructions to meet the requests of both parties have resulted in instructions that were clear and unambiguous and adequately covered the essential points of the theory of defense. *United States v. Green,* 779 F.2d 1313, 1321 (7th Cir. 1985).

The court presented two instructions to the jury that addressed Gray's theory of defense - Court's Instruction Number 17 on the definition of knowingly and Court's Instruction Number 31 on the defense of good faith. Court's Instruction Number 17 was modified in response to argument from Gray. Before the jury instruction conference, the court's proposed instruction on knowingly read:

> When the word "knowingly," or the phrase "the defendant knew," is used in these instructions, it means that the defendant realized what she was doing and was aware of the nature of her conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.

During the jury instruction conference, defense counsel argued that while this instruction covered ignorance, mistake, and accident, it did not specifically indicate

what the ignorance or mistake might have been in this case. (Trial Tr., Vol. 5, 117.) The government argued that the court's proposed instruction was appropriate. (*Id.* at 116.)

In consideration of Gray's proposed theory of defense, the court changed the instruction to clarify that if Gray acted through ignorance, mistake, or accident, then the jury should find that she did not act knowingly. (Trial Tr., Vol. 5, 119.) The instruction on knowingly given to the jury, Court's Instruction Number 17, read in relevant part:

> When the word "knowingly," or the phrase "the defendant knew," is used in these instructions, it means that the defendant realized what she was doing and was aware of the nature of her conduct. *In other words, if you find that the defendant acted through ignorance[,] mistake or accident, then you should find that she did not act knowingly.* Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.

(emphasis added). This instruction utilized part of Gray's proposed language but did not limit a finding of "knowingly" to just one act within the scheme to defraud. Thus, the court employed Gray's preferred language to the extent that it was appropriate but refused to submit an instruction that misstated the government's burden in the case. Thus, like the district court in *Green*, this court held a thorough jury instruction conference that resulted in a legally accurate instruction crafted to satisfy all litigants and to cover the essential points of the theory of defense.

Further, Court's Instruction Number 31 informed the jury that if Gray acted in good faith, then she did not act with intent to defraud. This instruction, based on Seventh Circuit Pattern Jury Instruction 6.10, stated:

20

> Good faith on the part of the defendant is inconsistent with intent to defraud, an element of the charges in this case. The burden is not on the defendant to prove her good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted wilfully with the intent to defraud.

(Court's Instruction Number 31.) Court's Instructions Numbers 17 and 31 sufficiently covered Gray's theory of defense and correctly stated the government's burden to prove intent. In *United States v. Jones*, the defendant wanted to submit an instruction to the jury that stated that she claimed she did not "know that she was breaking the law when she cashed her grandfather's Social Security checks" and that if the jury had "any reasonable doubt as to whether [the defendant's] mistake or ignorance of the law negates her intent to defraud, you must acquit her." No. 92-3941, 1993 U.S. App. LEXIS 14970, at *8 (7th Cir. June 18, 1993) (unpublished). The district court rejected this instruction and gave the jury an instruction that stated that the defendant did not act knowingly if she acted by mistake. *Id.* at *13. The Seventh Circuit found that the district court was not required to give the jury the defendant's proposed instruction because "its content was encompassed in the given instructions." *Id.*

When determining whether given instructions on "knowingly" and "intent to defraud" adequately covered a defendant's theory of defense of mistake, the Seventh Circuit has emphasized that provided instructions were sufficient when they clearly placed the burden of proving intent on the government. *Jones*, 1993 U.S. App. LEXIS 14970 at *13; *United States v. Schwartz*, 787 F.2d 257, 265 (7th Cir. 1986). The instruction given in this case clearly placed the burden to prove

intent on the government. Like in *Jones*, this court's instruction covered the essential points of Gray's defense even if it did not specify what acts Gray could have done by mistake, ignorance, or accident.

Further, as mentioned above, jury instructions are reviewed "in the context of the overall trial and the arguments of counsel." *Herrero*, 893 F.2d at 1536 (7th Cir. 1990) (internal quotations omitted). The Seventh Circuit has found that a district court did not err in rejecting a specific instruction when the charge submitted to the jury covered the essential points of the defense and defense counsel had the opportunity to make its specific argument during closing arguments. In *United States v. Reed*, the defendant requested an instruction stating: "[t]he mere presence of a fingerprint on a firearm is insufficient to prove possession of a firearm beyond a reasonable doubt." 539 F.3d 595, 599 (7th Cir. 2008). The Seventh Circuit found that this theory was covered by the court's instruction that possession needed to be done knowingly and that an action done through mistake or accident was not done knowingly. *Id.* at 599-600. The appellate court emphasized that during closing arguments the defense attorney had the opportunity to explain that the defendant came into contact with the gun by accident. *Id.* at 600.

Similarly, Gray's counsel was able to argue at closing arguments that:

There is nothing absurd about being assigned a task to input billing, being told by the provider, the person who is the legally responsible person, what code to use, and to rely on those codes. And what you will be told, ladies and gentlemen, is if, in fact, Wynell Gray did mistakenly use the wrong codes, if

she did so out of ignorance, accident, or mistake, that is not fraud. That is not
fraud.

(Trial Tr., Vol. 6, 34-35.) As this excerpt shows, in its closing arguments the
defense was able to address its specific theory of defense. As the transcript shows, the
defense was able to discuss how the definition of knowingly to exclude actions done by
mistake could be applied to the act of inputting the data.

In sum, the court did not err in rejecting the exact language of Gray's proposed
theory of defense instruction. The court modified its instruction in response to Gray's
arguments. Ultimately, the court provided a clear instruction that covered the essential
points of Gray's theory of defense and correctly stated the government's burden to
prove intent. At closing arguments, defense had the opportunity to fully explain how its
theory of defense, as presented to the jury, could apply to the specific facts of Gray's
case. Accordingly, the fact that the court did not present Gray's specific theory of
defense instruction to the jury does not present a substantial question for appeal.

c.      *The alleged Brady violation*

The third issue that Gray argues will present a substantial question on appeal is
whether the government committed a *Brady* violation by failing to provide the defense
with data that showed the time and date of Dovies' Medicaid billing submissions (this
data is referred to as "timestamp" data). (DE # 170 at 6-7.) The timestamp data was
gathered and held by Hewlett Packard, formerly called Electronic Data Storage
Systems, a private entity that contracted with Indiana Medicaid. The prosecution faxed

23

the defense the timestamp data for July 15, 2004 at 8:04 p.m. on April 19, 2010, two days before the end of trial. (DE ## 124 at 4, 124-1.)

Gray argues that in order to establish knowledge and specific intent, the government offered proof and argument that Gray was the sole biller for Dovies' Medicaid submissions. (DE # 170 at 7.) She argues that the timestamp data proved that the billing was submitted by multiple parties simultaneously and would have helped her to show that the billing "must have been submitted by other parties of whom [she] was unaware and with whom she did not enter into any agreement." (*Id.*) She argues that the potential effect of the timestamp data is a substantial question. (*Id.*) She also contends that because similar evidence was presented for both the Dovies and Lane schemes to defraud, the fact that the jury acquitted her of the charges related to Lane shows that the evidence presented against her at trial for Dovies was not overwhelming. (*Id.* at 7-8.)

In response the government argues that it did not suppress the evidence because the defense could have obtained it through reasonable diligence, the timestamp data was immaterial because it did nothing to diminish Gray's role in the offense, and the overall evidence against the defendant was strong.[1] (DE # 177 at 3-5.)

---

[1] The government argues that Gray was convicted for her involvement in Lane because she was convicted of Count 2 of the indictment. (DE # 177 at 5.) However, Count 2 of the indictment involves billing by Dovies for B. Hawkins. (DE # 1 at 4.) Defendant was not convicted of involvement in Lane.

In order to establish a *Brady* violation, "a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *Boss v. Pierce,* 263 F.3d 734, 740 (7th Cir. 2001). Evidence was suppressed if "(1) the prosecution failed to disclose evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of due diligence." *United States v. Todd*, 424 F.3d 525, 534 (7th Cir. 2005). The alleged *Brady* violation does not present a substantial question because, as this court has already determined in its order on Gray's motion for a new trial, the timestamp data was not material. (DE # 144 at 19.) After this court denied Gray's motion for a new trial, the defense obtained all of the timestamp information for Dovies from Hewlett Packard and both parties analyzed this information for their sentencing arguments. As will be discussed below, the full timestamp data bolsters the finding that this data was immaterial. In addition to this court's finding that the materiality of the data does not present a substantial question, the court finds that there is an additional reason that the alleged *Brady* violation does not present a substantial question. This reason is that the government did not suppress the data because it was in the control of a third party and the defense could have obtained this information through reasonable diligence.

First, the timestamp data was not material. Evidence is material for *Brady* purposes if there is a reasonable probability that the evidence in question would have produced a different result, that is does the exclusion of the evidence at trial undermine

confidence in the outcome of the trial. *Stickler v. Greene*, 527 U.S. 263, 291 (1999);

*Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *United States v. Kimoto*, 588 F.3d 464, 474

(7th Cir. 2009). The court finds that whether the timestamp data had a reasonable

probability of undermining confidence in the jury's determination of guilt is not a

substantial question. As this court discussed in its order denying a new trial, the jury

found Gray guilty of conspiracy to defraud Medicaid, and thus she is liable for all of the

wrongdoing undertaken by the conspiracy. The possibility that other members of the

conspiracy were billing at the same time as Gray would not have mitigated Gray's

culpability as part of the conspiracy. The timestamp data does not show that Gray had

no part in the conspiracy or did not do billing for Dovies. Further, there was evidence

submitted at trial that other people besides Gray did Medicaid billing for Dovies.

(*See* Trial Tr., Bettis, Vol. 2, 171) (stating that if there were questions about Medicaid

billing, Suddoth would either call Gray or Gray's mother.) Thus even with evidence that

other people did billing for Medicaid, the jury convicted Gray.

Further, the full timestamp data for Dovies and the parties' analysis of it

strengthens this court's finding that it was immaterial. In her analysis of all the

timestamp data, Gray points out that data shows that billing was done at a much faster

rate when the volume of the billing was higher, in June and July of 2004, than it was in

other months. (DE # 160 at 8-9.) She argues that the change in the frequency of billing

suggests that multiple people must have been billing in June and July. (*Id.* at 9.)

However, the government's analysis of the data shows that most, if not all, of the data

could have been entered by one person. It also explains how the claims submitted on the highest billing days could have been entered at a very quick rate.

The government's expert testified that the data could be entered at the rate of 40 seconds per claim. (Trial Tr., Davidson, Vol. 5, 75-78.) The government's analysis of the timestamp data determined that 94% of the claims from Dovies were submitted with more than 40 seconds between the submissions. (DE # 177 at 4; DE # 164 at 5.) The evidence from Hewlett Packard, as presented in a chart prepared by the government, showed that many of the time periods that were less than 40 seconds were time periods very close to 40 seconds such as 38 or 39 seconds. (*See e.g.*, DE # 164-1 at 71-72, 75-77, 83-85.) The government stated that its analysis of the full timestamp data from Hewlett Packard showed that much of the billing was done with long breaks in between billing periods. (DE # 164 at 5; DE # 164-2.)

Further, the evidence shows that on days when a high number of claims were billed, the claims were often only for a small number of clients. It is easier for one person to bill repeatedly for one client because the biller would only need to change a few fields on the online billing form and then he or she could resubmit the form. (DE # 164 at 6; DE # 164-3.) On July 15, 2004, when 1,415 claims were submitted by Dovies, they involved only fourteen different clients. (DE # 164-3 at 6.) On July 22, 2004, 716 claims were submitted for only seven different clients. (*Id.*) And on July 16, 2004, 825 claims were submitted for ten different clients. (*Id.*) On days when the volume of claims was highest and the time between claims shortest, the number of claims per

27

person was higher than on days when the volume was less and the time between claims was shorter. This undermines Gray's theory that the increased rate of submission in June and July suggests that there was more than one biller during that period. Accordingly, the timestamp data for all of Dovies' billing reinforces this court's finding that this evidence is immaterial.

Second, the alleged Brady violation does not present a substantial question because the timestamp data was not suppressed by the government as it was possessed by a third party and attainable by the defense through due diligence. Courts have recognized that the government's responsibility under *Brady* can extend to evidence beyond documents in the possession of the prosecution to that held by other government entities that are part of the prosecutorial team. *See United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997); *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). The Seventh Circuit has stated that the availability of evidence to the prosecution is measured by whether the evidence is in the possession of some arm of the state. *Crivens v. Roth*, 172 F.3d 991, 997-98 (7th Cir. 1999). Further "if a government agency is charged with the administration of a statute, and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution." *Bhutani*, 175 F.3d at 577.

The timestamp data was held not by an arm of the state, but by Hewlett Packard, a private entity that contracted with the state of Indiana. In *Bhutani*, the Seventh Circuit found that the prosecution was responsible for data held by the Federal Food and Drug

28

Administration ("FDA"), but it was not responsible for finding out what data a third party, non-governmental entity held or how it was going to interpret that data. (*Id.*) Further, in *United States v. Hach*, the court held that the prosecution has no obligation to seek out exculpatory records from third parties. 162 F.3d 937, 947 (7th Cir. 1998.) It follows that Hewlett Packard would not be considered part of the prosecution team since it was not a government agency but a third party contractor of the government.

Even more, the record shows that there is no substantial question that the government suppressed the timestamp data because the defendant could have obtained the data from Hewlett Packard through reasonable diligence. *Hamilton*, 107 F.3d at 510 ("The government will not be found to have suppressed information if that information was available to the defense through the exercise of reasonable diligence."). In *Hamilton*, the court found that the government did not suppress a written statement that had been given to it by a witness when the defense team was given funds for an investigator and the investigator could have asked the witness if he had given any statements. *Id.* at 508-10.

Here, the defense team included an expert who participated in formulating and executing Gray's discovery requests. This expert, Christine Miller, was a certified medical practice administrator with experience in over one thousand audits and working for both the defense and prosecution on Medicaid fraud cases. (DE # 177 at 3; Trial Tr., Miller, Vol. 5, 7, 9.) Particularly with the assistance of its expert, the defense could have obtained the timestamp information from Hewlett Packard. In response to

the defendant's motion for the government to produce the timestamp data prior to Gray's sentencing, the court asked the defense to submit additional briefing explaining, in part, why it could not procure the data directly from Hewlett Packard. (DE # 145.) Gray did not address this request in her briefing. (DE # 147.) Instead, the defense prepared a subpoena to obtain the information directly from Hewlett Packard. (DE # 147 at 2; DE # 146.) Hewlett Packard obliged this request quickly and readily. (*See* DE ## 152, 153.) Thus it appears that the defense had the expert resources to formulate a request to obtain the timestamp data and that Hewlett Packard would have been able to remit this information if asked.

Gray may argue that she did not seek any information directly from Hewlett Packard because partial disclosure of information from the government misled her to believe that all information had been provided. (*See* DE # 138 at 7.) However, it is not clear that the defense requested timestamp data from the government. The defense has asserted to this court, without citation, that during discovery it requested "all underlying data held by Medicaid, including records of the billing date, date of service, date of payment by Medicaid, amount billed, amount paid, and patient identification number." (DE # 124 at 7.) Subsequently, a telephone conference took place with defense counsel, government counsel, the defense's expert, and the government's investigating Medicaid Fraud agents. (DE # 124 at 8.) A second call occurred between the defense expert and the Medicaid Fraud agents. (*Id.*)

The government has submitted a sworn affidavit from one of these agents stating that at no point during either conversation did the defense ask her or the other agent "to determine if [Hewlett Packard] captured and maintained time submission data for the Dovies" claims. (DE # 136-1 at 1.) She also states that "without qualification" at no time before the evening of April 15, 2010, was she aware that [Hewlett Packard] captured or maintained records of the time of submissions. (*Id.*) The defense argues that it requested "extensive materials retained by Indiana Medicaid" and that the government "failed to indicate that any other data was kept by [Hewlett Packard] but had not been provided to the defense." (DE # 138 at 7.) Gray argues that her requests "should have put the government on notice that the defense was seeking to analyze data held by Indiana Medicaid and that all such data had potential relevance." (*Id.*) Thus, she appears to back away from her assertion that she specifically requested timestamp data. Further, the timestamp data was not held by Indiana Medicaid; it was held by a third party contractor.

It seems that the defense obtained some information held by Hewlett Packard by making discovery requests to the government. However, it also appears that Gray was aware that Hewlett Packard held much of the data about the Medicaid billings. There is also evidence that the government's agents were not aware that Hewlett Packard held timestamp data. In an exercise of reasonable diligence the defense and its Medicaid expert could have made some requests directly to Hewlett Packard.

In sum, Gray's allegation of a *Brady* violation related to the timestamp data for Dovies does not present a substantial question for appeal because the information was immaterial and obtainable by the defense from a third party through reasonable diligence. Because the court has found that none of the proposed issues for appeal raises a substantial question, it does not need to determine whether any of these issues is of the type that would be likely to result in a reversal or new trial. Consequently, Gray's motion to be released on bond pending appeal is **DENIED**. (DE # 170.)

**SO ORDERED.**

Date: January 28, 2011

s/James T. Moody                              
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT